IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRYANT DAVIDSON,<br>Plaintiff | * | |
| | * | CIVIL ACTION NO. WDQ-13-2583 |
| V. | * | |
| WEXFORD'S HEALTH SOURCES<br>INCORPORATED, *et al.*,<br>Defendants. | * | |

\*\*\*\*\*\*

### MEMORANDUM

Pending is Defendant Wexford's Health Sources, Inc.'s ("Wexford") and Janice Gilmore,

R.N.'s Motion to Dismiss or for Summary Judgment.[1] ECF No. 20. The Plaintiff has responded,

and the Defendants have replied. ECF Nos. 22, 26-29. No hearing is necessary. *See* Local Rule

105.6 (D. Md. 2011). For the reasons stated below, summary judgment will be granted.

### Background

On September 5, 2013, the Plaintiff, an inmate presently incarcerated at the Western

Correctional Institution ("WCI"), filed a *pro se* complaint alleging that he was denied medical

care due to budgetary constraints. ECF No. 1 at 1. Specifically, the Plaintiff alleges that Janice

Gilmore, the managing nurse, called physicians ahead of his medical visits to prevent him from

getting "proper and adequate treatment" for his scoliosis and a stab wound to his back. *Id.* The

Plaintiff alleges that he is only provided a "certain amount of physical therapy. . . due to budgetary

restraints," even though his therapist has requested additional visits. *Id.* Additionally, the

Plaintiff states that his prescribed back brace was taken from him while he was being transported

---

[1] The motion was not filed on behalf of Defendant Naa E. Odifie, who has not been served with
the Complaint.

1

and has not been replaced. *See id.* He alleges that denial of the back brace causes him to suffer extreme pain. *Id.*

The Plaintiff also alleges that Gilmore contacted physicians to have his pain medication discontinued, *id.*, and "told a physician not to give [him] a permanent wheelchair when the physician believed [he] needed one, ECF Nos. 13, 14. He further alleges that he has been repeatedly targeted by Gilmore. *Id.*; *see* ECF No. 13. He seeks damages and to have Gilmore reprimanded and removed from her position. *See Id.*

Through a supplemental complaint, the Plaintiff alleges that on September 26, 2013, he was denied treatment by Physician's Assistant ("PA") Quinta Lum. *See* ECF No. 7 at 2. The Plaintiff states that he was in extreme pain on that date, but he was not given any treatment. *See id.*; ECF No. 5 at 2. The Plaintiff requests an order prohibiting PA Lum from practicing within WCI. ECF No. 5 at 2. The Plaintiff further alleges that Dr. Joubert has been rude to him, and requests that Dr. Joubert be reprimanded.[2] *See* ECF No. 7 at 1-2, 4.

The Plaintiff also alleges that Naa E. Odifie, R.Ph, employed by Correct Rx Pharmacy, has denied the Plaintiff his prescribed medication. ECF No. 12 at 1-2. The Plaintiff alleges that Odifie is not qualified to deny the orders of his physician and physical therapist for medication and orthopedic devices. *See id.*; ECF No. 12-1 at 1.

Finally, the Plaintiff claims that the Defendants' actions violate the Americans with Disabilities Act ("ADA"), because they have failed to provide physical therapy, a specialized back brace, prescribed medication, and an adequate wheelchair. *See* ECF No. 19.

---

[2] Dr. Joubert and PA Lum have not been added as Defendants in these proceedings, and as such they have not been served with the Complaint.

The Plaintiff's medical records demonstrate that he has a history of chronic pain, which the Defendants describe as "a psychosocial disorder that occurs in some patients with chronic non-cancer pain in which symptoms of the pain consume the attention of the patients and becomes incapacitating." ECF No. 20-1 at 2 & n.2. The Plaintiff also suffers from drug dependency, scoliosis, and asthma. ECF No. 20-1 at 2, Exs. 1, 2. The Plaintiff also suffers from mental health issues, including personality disorder, bipolar disorder, and impulse control disorder, and has attempted suicide. *Id.* In response to his mental health issues, the Plaintiff has been treated with psychotropic medications prescribed by mental health providers, and his mental health condition is monitored by the mental health staff. *Id.*

On February 15, 2013, the Plaintiff was transferred from Jessup Correctional Institution ("JCI"), where he had been approved for physical therapy, to the North Branch Correctional institution ("NBCI"). *Id.*, Ex. 1 at 2. Upon his admission to NBCI, the Plaintiff was evaluated by Dr. Ottey. ECF No. 20-1 at 3, Ex. 1 at 4-6. The Plaintiff complained of back pain and stated that he had been using a wheelchair for more than a year, although he walked into NCBI without a wheelchair. *Id.* The Plaintiff appeared to be in no distress, but his spine was positive for posterior tenderness and paravertebral muscle spasm. *Id.* The Plaintiff was prescribed Tylenol No. 3 for pain relief, referred to a psychiatrist for evaluation and treatment, and a chest x-ray was ordered. ECF No. 20-1 at 3-4, Ex. 1 at 7. The x-ray showed scoliosis in his thoracic spine. *Id.*

On February 21, 2013, the Plaintiff was evaluated for physical therapy. ECF No. 20-1 at 4, Ex. 1 at 8. He stated that he could not functionally use his lower extremities or walk. *Id.* He indicated that it was painful to stand, and he could not accomplish daily activities such as showering, sitting to eat, or using the toilet. *Id.* He denied bowel or bladder incontinence and indicated that his pain level on any activity was a 10 out of 10. *Id.* The examiner noted that the

3

Plaintiff demonstrated some control over his right lower extremity but not his left. *Id.* The examiner questioned the consistency of effort exerted by the Plaintiff during his evaluation. *Id.* Also, a "Slump test" could not be performed due to the Plaintiff's refusal to cooperate.[3] *Id.* As a result of this evaluation, the Plaintiff was diagnosed as suffering from lumbar derangement and left lumbar radiculopathy, and six sessions of physical therapy were ordered. ECF No. 20-1 at 4-5, Ex. 1 at 8. The goals of physical therapy were to increase the Plaintiff's functional mobility and to decrease his pain level. *Id.*

On February 23, 2013, the Plaintiff was seen by a physical therapist, but complained of too much pain to participate in therapy. ECF No. 20-1 at 5, Ex. 1 at 10. On February 27, 2013, paperwork allowing the Plaintiff the use of a wheelchair for three months was processed. *Id.* at 11.

On February 28, 2013, the Plaintiff was evaluated by Dr. Joubert. *Id.* at 12-13. The Plaintiff requested admission to the infirmary, indicating that he could not stand and was urinating and defecating on himself. *Id.* Dr. Joubert noted that the Plaintiff appeared not to be in acute distress, but he would not get out of his wheelchair for assessment. *See id.* The plaintiff stated that he was able to stand the previous month. *Id.* Examination of the Plaintiff's spine was negative for posterior tenderness, and he was able to raise his lower extremities approximately 20 degrees. *Id.* Dr. Joubert determined that it was not necessary to admit the Plaintiff to the infirmary. *Id.* The Plaintiff was prescribed Neurontin[4] and a muscle relaxant to assist with pain management and to allow him to tolerate physical therapy. *Id.* Prednisone, an anti-inflammatory,

---

[3] The "Slump Test" is used as a diagnostic tool in evaluating leg and back pain. ECF No. 20-1 at 4 n. 7.

[4] On March 1, 2013, the prescription request was approved. ECF No. 20-1 at 6, Ex. 1 at 20.

was also prescribed. *See id.* The Plaintiff was to be seen daily by a nurse to assess his toileting

needs. *See id.* Dr. Joubert also ordered an MRI of the Plaintiff's thoracic and lumbosacral spine

and an x-ray of his spine. ECF No. 20-1 at 6, Ex. 1 at 17. The x-ray showed significant scoliosis

in the lumbar spine, but the Plaintiff's vertebral bodies and disc spaces were normal. *Id.* at 19.

On February 29, 2013, the Plaintiff was again seen for physical therapy. *Id.* at 16. He

reported experiencing pain at 10 out of 10, and that he was no longer in possession of his

prescribed back brace. *Id.* He required moderate assistance to transfer to the table and could not

walk. *Id.* It was recommended that his plan of care be continued. *Id.*

On March 2, 2013, the Plaintiff was seen again for physical therapy, during which he

continued to complain of pain, and his course of treatment was continued. *Id.* at 21. On March 7,

2013, the Plaintiff was again seen for physical therapy. *Id.* at 26. He reported some pain relief in

his lower back, and continuation of treatment was recommended. *Id.*

On March 12, 2013, the Plaintiff was seen by Dr. Ottey. *Id.* at 29-30. He complained of

pain and told Dr. Ottey that he had difficulty getting to the door for medication and meals. *Id.*

Physical examination revealed no apparent distress; however, the Plaintiff's spine was positive for

posterior tenderness and paravertebral muscle spasms and he had decreased motor ability in both

lower extremities. *See* ECF No. 20-1 at 7, Ex. 1 at 29-30. The Plaintiff's medications were

renewed, and an order to bring the Plaintiff out of his cell twice daily for medication was put in

place. *See id.* The same day, the Plaintiff was again seen for physical therapy. *Id.* at 31. He

again stated that he had difficulty getting to the door for food and medication, and stated that he

might discontinue physical therapy. *Id.* That same day, he was transferred to WCI. *Id.* at 32.

On March 14, 2013, the Plaintiff was seen for physical therapy. *Id.* at 33. He reported his

pain as 6-7 out of 10. *Id.* It was noted that he was doing well with his exercises. *Id.* On March

16, 2013, the Plaintiff was evaluated by Dr. Joubert.  *Id.* at 34-35.  The Plaintiff advised Dr. Joubert that he had not received Prednisone since his transfer to WCI, and Dr. Joubert renewed the prescription order.  *Id.*

On March 21, 2013, Dr. Joubert again evaluated the Plaintiff.  *Id.* at 36-37.  The Plaintiff requested continuation of his physical therapy.  *Id.*  A request for additional therapy was submitted, and, on March 26, 2013, six additional sessions were approved.  *Id.* at 38-40.

On March 28, 2013, the Plaintiff resumed physical therapy.  *Id.* at 41.  He reported his pain as 10 out of 10.  ECF No. 20-1 at 8, Ex. 1 at 41.  Continuation of physical therapy was recommended.  *Id.*

On April 1, 2013, he was evaluated by PA Katie Winner, and he reported increased pain from physical therapy.  *Id.* at 42-43.  No distress was noted, but posterior tenderness at the scoliosis spine was observed.  *Id.*  His prescription for Tylenol No. 3 was renewed.  *Id.*

On April 8, 2013, the Plaintiff was evaluated by PA Lum.  *Id.* at 47-48.  The Plaintiff requested continuation of physical therapy.  *Id.*  It was noted that the Plaintiff's last physical therapy session was held on March 28, 2013, but no recommendation for extending the physical therapy had been received.  *Id.*  The Plaintiff's medications were reviewed and continued, and a request for additional physical therapy was submitted.  *Id.* at 46-48.

On April 12, 2013, Dr. Joubert examined the Plaintiff.  *Id.* at 47-48.  At the Plaintiff's request, the Tylenol No. 3 prescription was renewed for one month, *id.*, and additional physical therapy was approved on April 16, 2013, *id.* at 49.

On April 18, 2013, the Plaintiff resumed physical therapy.  *Id.*  He complained of pain but tolerated the exercises.  *Id.*  The following day, he was seen for physical therapy but stated that he was too sore from the previous day's treatment to complete the sessions.  *Id.* at 52-53.

On April 22, 2013, the Plaintiff refused to go to physical therapy, because he preferred to get a shower. ECF No. 20-1 at 8-9, Ex. 1 at 54. On April 30, 2013, physical therapy was scheduled but not provided. ECF No. 20-1 at 9, Ex. 1 at 54. Notes reflect that the Plaintiff refused physical therapy—although the Plaintiff reported that no correctional officers arrived to escort him. *Id.* at 55. The Plaintiff was scheduled for physical therapy on May 2, 7, and 9, 2013, but did not receive it because he was out of the facility. *Id.* at 56-58.

On May 11, 2013, the Plaintiff was evaluated by Nurse Adams due to complaints of numbness in his legs and hands. *Id.* at 59-61. His examination revealed strong bilateral grip and a steady gait. *Id.* The Plaintiff denied difficulty or incontinence of urine or stool. *Id.* He had no apparent symptoms of pain or difficulty sitting, standing or walking. *Id.* He was referred to a physician due to his numbness complaints and complaints that his pain medication did not last twelve hours and he desired something stronger. *Id.*

On May 14, 2013, the Plaintiff refused to go to physical therapy. *Id.* at 62. On May 16, 2013, he was reevaluated for physical therapy, during which he was noted to have improved mobility in bed, with transfers, and with standing. *Id.* at 63. Six additional therapy sessions were recommended as well as continuation of pain medications. *Id.*

On May 17, 2013, the Plaintiff was seen by Nurse Wilt due to complaints of back pain. *Id.* at 65-66. He reported that his back gave out while rising form the toilet, and he fell to the floor. *Id.* Upon examination, palpation elicited no painful responses. *Id.* The Plaintiff's arms and legs were moved without pain, and the Plaintiff was observed moving his arms and legs without pain. *Id.* The Plaintiff threatened to sue, because of the discontinuation of his prescription for Tylenol No. 3. *Id.* The Nurse referred the Plaintiff to the physician for follow up. *Id.*

7

On May 21, 2013, the Plaintiff was seen for physical therapy. ECF No. 20-1 at 10, Ex. 1 at 67. He reported that he had not received pain medication since May 12, 2013. *Id.* He was able to transfer to the table without assistance, and he presented a "guarded appearance." *Id.*

The following day, the Plaintiff was evaluated by PA Lum. *Id.* at 68-69. The Plaintiff indicated that he could not fully participate in physical therapy due to his level of pain and requested renew of his Tylenol No. 3 prescription, which was granted. *Id.* PA Lum reviewed the Plaintiff's treatment options with Dr. Joubert. *Id.*

On May 23 and 28, 2013, the Plaintiff continued physical therapy. *Id.* at 70-71. On May 23, he complained of pain but stated that he had just received pain medication. *Id.* On both dates, he could walk without shuffling. *Id.*

On May 31, 2013, Dr. Joubert reevaluated the Plaintiff to determine whether additional physical therapy would be beneficial. *Id.* at 72-73. The examination revealed spinal deformity and decreased thoracic and lumbar mobility. *Id.* The Plaintiff's scoliosis spine was negative for posterior tenderness with normal lateral flexion. *Id.* Given the Plaintiff's progressive scoliosis, Dr. Joubert determined that he would benefit from additional physical therapy. *Id.* Dr. Joubert continued the Plaintiff's prescriptions for Tylenol No. 3 and muscle relaxants and submitted a request for further physical therapy. *See id.* at 72-74.

On June 6, 2013, the Plaintiff's pain medications were reviewed by PA Winner, and his prescriptions for Neurontin and Tylenol No. 3 were renewed. ECF No. 20-1 at 11, Ex. 1 at 76-77.

On June 27, 2013, six additional physical therapy sessions were approved. *Id.* at 79. The following day, he submitted a sick call slip requesting to resume physical therapy. *Id.* at 80-82. On July 2, 2013, the Plaintiff was seen by Certified Registered Nurse Practitioner ("CRNP")

8

Mahler. *Id.* CRNP Mahler told the Plaintiff that he had been approved for additional physical therapy, and his prescriptions for the muscle relaxer and Tylenol No. 3 were again renewed. *Id.*

On July 9, 2013, the Plaintiff resumed physical therapy. *Id.* at 83. It was noted that his strength had decreased since his last physical therapy session on May 28th. *Id.* He was, however, able to tolerate the physical therapy exercises. *Id.* On July 11, 2013, he received physical therapy again, but declined therapy on July 17, 2013 because he was in line for his pain medication. *Id.* at 84-86. On July 18, 2013, he had another physical therapy session, during which he noted that he was in pain but was able to perform his exercises. *Id.* at 85.

On July 24, 2012, PA Winner saw the Plaintiff and ordered renewal of his wheelchair and wheelchair pusher for the duration of his physical therapy. *See id.* at 87-88.

On July 30 and August 1, 2013, the Plaintiff had physical therapy sessions and tolerated his exercises. ECF No. 20-1 at 12, Ex. 1 at 89-90. On August 1, 2013, he stated that the heat treatments helped alleviate his pain, and he desired to continue physical therapy. *Id.* at 90. The Physical Therapist determined that the Plaintiff would benefit from continuation of therapy. *See id.* at 89-90. On August 2, 2013, the Plaintiff was seen by CRNP Mahler, who submitted a request for additional physical therapy, at the Plaintiff's request. *See id.* at 91-93.

On August 21, 2013, the Plaintiff submitted a sick call slip regarding his desire to continue physical therapy. *Id.* at 95. On August 23, 2013, the Plaintiff was seen in the chronic care clinic by Dr. Joubert. *Id.* at 96-97. He appeared to be in no apparent distress and reported that his asthma had been symptom-free for two weeks. *Id.* The Plaintiff's medications were continued. *Id.*

9

On August 28, 2013, the Plaintiff was seen by PA Lum and again requested continuation of physical therapy. *Id.* at 98. PA Lum noted that a request had been submitted, which was "pending collegial response." *Id.* The Plaintiff's medications were continued. *Id.*

On August 30, 2013, the Plaintiff was seen by Dr. Joubert due to his complaints of lower back pain. *See id.* at 100-01. The Plaintiff was educated on various stretching and yoga exercises. ECF No. 20-1 at 13, Ex. 1 at 100-01. The following day, the Plaintiff submitted a sick call request seeking the return of his "specially fitted" back brace from Hanger, Inc. ("Hanger"), an orthopedic supply store. *Id.* at 102.

On September 4, 2013, the Plaintiff submitted a sick call request complaining of difficulty using the bathroom, shooting pains in his legs, and numbness in his buttocks. *Id.* at 103. On September 9, 2013, was seen by medical staff, who noted that the Plaintiff had been seen by Dr. Joubert on August 30, 2013, for the same complaints. *Id.*

On September 6, 2013, he was seen by Nurse Martin, at which time he complained of constipation and difficulty urinating. *Id.* at 102. He again requested his back brace, and renewal of his prescription for Tylenol No. 3. *Id.* at 104. His medications were reviewed, and his current plan of care was continued. *Id.* He was also referred to a provider, and the pharmacy requested to contact the provider regarding renewal of Tylenol No. 3. *Id.* at 104.

On September 9, 2013, the Plaintiff was seen by Dr. Joubert. *Id.* at 106-07. He again complained of intermittent urinary hesitancy and described his urine as burning and odorous. *Id.* He told Dr. Joubert that pain medication helped his urination. *Id.* The Plaintiff was advised that bladder catheterization may be necessary to determine residual urine. *Id.* A urine culture was ordered, and the Plaintiff was directed to increase his fluid intake. *Id.* On September 11, 2013, the Plaintiff declined to be seen by a provider, because of his pending lawsuit. *Id.* at 107.

10

On September 19, 2013, the Plaintiff was evaluated by Nurse Martin about his request for renewal of the Tylenol No. 3 prescription and physical therapy. ECF No. 20-1 at 14, Ex. 1 at 108-09. He was referred to a provider for follow up. *Id.* On September 23, 2013, the Plaintiff again submitted a sick call slip requesting renewal of his pain medication. *Id.* at 110. He stated that he could not do his exercises without the medication, and that he had filed a court case about the issue. *Id.* On September 20, 2013, the Plaintiff's sick call slip was reviewed by Dr. Joubert, but the Plaintiff refused to be evaluated by Dr. Joubert. *Id.* at 112.

On September 26, 2013, the Plaintiff was evaluated by Nurse Adams, because of chest pain complaints. *Id.* at 111-12. He requested pain medication, but Nurse Adams advised him that he was being evaluated only for chest pain, which he denied having at the time of the examination. *Id.* The Plaintiff requested to see a provider immediately for renewal of his Tylenol No. 3 prescription. *Id.*

On October 1, 2013, the Plaintiff was seen by Dr. Ottey, because of complaints of back pain. *Id.* at 113-15. The Plaintiff again requested reissue of his back brace. *Id.* The Plaintiff reported no incontinence, but he reported numbness and tingling. *Id.* His prescription for Tylenol No. 3 was renewed for five days. *Id.* Additionally, he was prescribed non-formulary Mobic for three months; however, the non-formulary request was denied the following day in preference to formulary orders for ibuprofen or naproxen. *Id.* at 119. On October 16, 2013, however, Mobic was approved in order to decrease the Plaintiff's "pill load." ECF No. 20-1 at 15, Ex. 1 at 120.

On October 7, 2013, the Plaintiff was seen by CRNP Mahler for medication renewal. *Id.* at 121-22. CRNP Mahler noted that Dr. Ottey had renewed the Tylenol No. 3 prescription for five days. *Id.* The Plaintiff stated that the prescription was to be renewed for a longer period. *Id.* The Plaintiff's prescription for Neurontin was renewed for one month, and the Tylenol No. 3

11

prescription was renewed for one week. *Id.* The Plaintiff's wheelchair and wheelchair pusher were renewed for an additional three months. *Id.* Also, a referral to see the provider was generated. *Id.* CRNP Mahler noted that no response to the August 2nd request for additional physical therapy had been received and another request would be generated. *Id.* A consultation request for physical therapy was submitted along with a request for Neurontin. *Id.* at 123-26.

On October 21, 2013, the Plaintiff submitted a sick call request for a back brace. *Id.* at 127. On October 24, 2013, the Plaintiff was seen by CRNP Mahler. *Id.* at 130-32. The Plaintiff stated that he had spoken with a lawyer who advised him that Wexford must pay for another brace, because the previous one was confiscated at a different institution. *Id.* He complained that Mobic was ineffective for pain relief, and he desired to return to Tylenol No. 3. *Id.* The Plaintiff's prescription for Mobic was increased and renewed for four months,[5] and his prescription for Tylenol No. 3 was renewed for one week. *Id.* A consult was placed with Hanger for the back brace. *Id.* On October 25, 2013, CRNP Mahler noted that the request regarding the back brace had been referred to a physician on October 8, 2013. *Id.* at 127-133. Additionally, on October 31, 2013, CRNP Mahler submitted a consult request for evaluation of a scoliosis back brace by an orthopedist, Dr. Carls. ECF No. 20-1 at 16, Ex. 1 at 134-35.

The same day, the Plaintiff was evaluated by Dr. Barrera. *Id.* at 136-37. The Plaintiff complained of back pain and spasms radiating to the right lower extremity. *Id.* He stated that his back brace and physical therapy alleviated his pain. *Id.* He complained of changes in his bowel movements and urination, but he denied incontinence. *Id.* He was diagnosed as suffering severe dorso-lumbar scoliosis. *Id.* His prescription for Tylenol No. 3 was renewed for two weeks, and

---

[5] On October 25, 2013, the prescription for Mobic was approved. ECF No. 20-1 at 15, Ex. 1 at 128-29.

his Neurontin was stopped. *Id.* A non-formulary request for Lyrica was submitted but denied pending an explanation for the change in therapy. *Id.* at 138-39. A request for evaluation of the need for a back brace was submitted. *Id.* at 140. On November 1, 2013, the request for Lyrica was again denied because of its euphoric side effects. *Id.* at 141-42. The following day, the Plaintiff was seen by Nurse Schafer due to his complaint that he had not received his prescribed Mobic for pain relief. *Id.* He was advised that Mobic had been approved, but he had to wait for it to arrive from the pharmacy. *Id.* at 144.

On November 3, 2013, the Plaintiff submitted a sick call request seeking continuation and correction of his medication and complaining that the request for additional physical therapy and a back brace had been under consideration for almost 90 days. ECF No. 20-1 at 17, Ex. 1 at 146. When scheduled to receive an examination by PA Lum, the Plaintiff refused to be seen. *Id.* at 147-48.

On November 8, 2013, the Plaintiff was seen by Dr. Barrera, who increased his Neurontin prescription due to the Plaintiff's complaints of pain. *Id.* at 149-50. A non-formulary request was submitted. *Id.* at 149-51. The request was denied, because the dosage was too high to effectively treat chronic pain. *Id.* at 153. On November 13, 2013, a lower dose of Neurontin was prescribed along with a muscle relaxer and Tylenol No. 3. *Id.* at 154-55. Also, the Plaintiff was prescribed an anti-depressant, which is also used to treat neuropathic pain. *Id.* The Neurontin prescription was approved the same day. *Id.* at 156.

On November 18, 2013, the Plaintiff was seen by CRNP Mahler in the chronic care clinic. *Id.* at 160-62. His asthma and scoliosis were reviewed. *Id.* He reported compliance with his medication, and that his symptoms had stabilized. *Id.* His asthma medication was renewed, and he was directed to follow up in the chronic care clinic in three months. *Id.* He reported that the

pain medication helped his scoliosis. *Id.* He was advised that Dr. Carls recommended the Plaintiff be provided a back brace, and a request for a consult for the brace would be submitted that day. *Id.* at 160-63.

On December 4, 2013, Dr. Barrera next evaluated the Plaintiff. *Id.* at 164-65. The Plaintiff reported that his pain was better controlled with Neurontin 1200 mg twice daily, and his prescription for Neurontin was accordingly increased, and his prescription for Tylenol No. 3 was renewed. ECF No. 20-1 at 18, Ex. 1 at 164-66. On December 7, 2013, an order for a permanent wheelchair pusher was placed. *Id.* at 168.

On January 2, 2014, the Plaintiff was seen by CRNP Mahler. *Id.* at 169-70. He requested renewal of Neurontin and Tylenol No. 3. *Id.* The Plaintiff reported that he still had not received his specially fitted back brace from Hanger or received physical therapy. *Id.* He was advised that the request for the specially fitted back brace had been denied on November 18, 2013, in favor of a regular back brace. *Id.* The Plaintiff stated that he did not want a regular back brace. *Id.* His prescriptions for Neurontin and Tylenol No. 3 were renewed. *Id.* The request for a specially fitted back brace and physical therapy were resubmitted. *Id.* at 171-78.

On January 7, 2014, after evaluation of the Plaintiff, the order for a wheelchair and wheelchair pusher were renewed. *Id.* at 179-182. The same day, the requests for a fitting with Hanger for the back brace and renewed physical therapy were approved. *Id.* at 183. On January 11, 2014, the Plaintiff was offered a back brace, which he declined stating that it was "not the one I usually get." *Id.* at 184.

14

On January 23, 2014, the Plaintiff submitted a sick call slip requesting renewal of his medication because he was beginning more physical therapy.[6] *Id.* at 186. The same day, he was evaluated for physical therapy. ECF No. 20-1 at 19, Ex. 1 at 187. It was noted that the Plaintiff could stand and transfer independently. *Id.* His range of motion in both lower extremities was within functional limits, but hip and knee movement increased his lower back pain. *Id.* The Plaintiff was able to walk a few steps with a walker for assistance. *Id.* The goals of his physical therapy were to accomplish all functional mobility tasks in and out of the wheelchair with no greater than 4 out of 10 pain response, and to establish a self-management plan. *Id.*

On January 28, 2014, the Plaintiff began physical therapy and had sessions on January 29, February 1, and February 5, 2014. *Id.* at 192-95.

On February 5, 2014, Dr. Barrera evaluated the Plaintiff in the chronic care clinic for asthma and scoliosis. *Id.* at 196-98. The Plaintiff complained that his pain was worse and said that Nubain had previously provided relief. *Id.* at 196-97. Dr. Barrera advised the Plaintiff that Nubain was non-formulary, but he would prescribe one shot of Toradol (a non-steroidal anti-inflammatory drug used for the short term management of moderately severe acute pain) for the next day. *Id.* On February 6, 2014, Dr. Barrera submitted a non-formulary request for Nubain, but it was determined that Nubain was a formulary drug. *Id.* at 199-202.

On February 7, 2014, the Plaintiff received physical therapy. *Id.* at 204. That day, Dr. Barrera was informed that Nubain was a formulary drug; however, Dr. Barrera decided to continue with injections of 30 mg Toradol twice a week, on the days of the Plaintiff's physical

---

[6] On January 28, 2014, the Plaintiff's prescriptions were renewed by CRNP Mahler. ECF No. 20-1 at 19, Ex. 1 at 190-91.

therapy. ECF No. 20-1 at 20, Ex. 1 at 205.  The Plaintiff was advised to follow up with his regular provider via a sick call slip. *Id.*

On February 11, 2014, the Plaintiff received physical therapy. *Id.* at 206.  The Plaintiff stated that he was making progress, and his therapist recommended more physical therapy. *Id.*

On February 19, 2014, the Plaintiff submitted a sick call request again seeking a Hanger specially fitted back brace and medication renewal. *Id.* at 208.  He was seen by RNP McLaughlin the following day. *Id.* at 209.  The Plaintiff requested daily injections of Toradol and was advised that it was contraindicated. *Id.*  The Plaintiff also requested extension of his Tylenol No. 3 prescription. *Id.*  The Plaintiff was referred to his provider and was told that the status of his back brace would be checked. *Id.*

In his opposition, the Plaintiff alleges that he has been provided an inadequate wheelchair, because his wheelchair is broken and dangerous.[7]  ECF No. 22 at 4.  He also states that he has yet to receive the specially fitted back brace. *Id.* at 3.  He further alleges that the distribution of his medication is problematic in that he was to receive medication to control his pain every eight hours but rather receives it in 14-15 hour intervals.[8]  *Id.*

---

[7] In a supplemental opposition, the Plaintiff states that his wheelchair has a broken wheel on the right side, a broken armrest on the right side, and a broken alignment which prevents the wheelchair from being pushed straight. ECF No. 27.  The Plaintiff has provided an affidavit from his wheelchair pusher who avers that he had difficulty pushing the wheelchair straight because of a broken right wheel and broken alignment. *Id.*  He opines that it made the wheelchair unsafe. *Id.*  He further states that it was worse in the snow because the pathways were not cleared. ECF No. 29.

[8] The Plaintiff also correctly noted that Gilmore's affidavit supplied the wrong case caption and referenced the incorrect Plaintiff. ECF No. 24.  The error in the case captioning was corrected; however the reference in the body of the affidavit to the incorrect inmate remained. ECF Nos. 25, 26; *see* ECF No. 27 (highlighting the continued error). The error has now been corrected. ECF No. 28.  It also appears that the Plaintiff received an affidavit filed in another matter. ECF No. 27, Ex. B.  The exhibit was not filed in this case by the Defendants, and the Defendants acknowledge

16

Joanne Price avers that wheelchairs are inspected monthly by correctional staff.  ECF No. 28, Ex. 2.  On March 15, 2014, the wheelchair was sent for repair.  *Id.*  Upon inspection in April, 2014, it was found to be in satisfactory condition.  *Id.*  It was previously inspected in October, November, and December, 2013 and January, 2014, and found satisfactory on each occasion.  *Id.* While the Plaintiff's wheelchair was in for repair, a substitute wheelchair was available.  *Id.*

## Standard of Review

Federal Rule of Civil Procedure 56(a) provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion; "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in [his] favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

---

that if they forwarded a copy of that exhibit to the Plaintiff, it was error.  ECF No. 28.

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (*citing Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson*, the Supreme Court explained that, in considering a motion for summary

judgment, the "judge's function is not himself to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249. A dispute

about a material fact is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he

thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury

could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any

material fact. *Id.* at 256. No genuine issue of material fact exists if the nonmoving party fails to

make a sufficient showing on an essential element of his case on which he would have the burden

of proof. *See Celotex*, 477 U.S. at 322-23. Therefore, on those issues on which the nonmoving

party has the burden of proof, it is his responsibility to confront the summary judgment motion

with an affidavit or other similar evidence showing that there is a genuine issue for trial. *See id.* at

323-24.

A.   *Respondeat Superior*

Plaintiff's complaint seeks to hold Wexford and Janice Gilmore responsible for the actions

of their subordinates on the basis of *respondeat superior,* which does not apply in § 1983 claims.

*Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *see also Trulock v. Freeh*, 275 F.3d 391,

402 (4th Cir. 2001) (no *respondeat superior* liability in a *Bivens* suit). Liability of supervisory

officials is "premised on 'a recognition that supervisory indifference or tacit authorization of

18

subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (*citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

The Plaintiff alleges that Gilmore interfered with his medical care. He appears to premise his claim of denial of medical care on her supervisory role. Gilmore avers that she is the regional administrator of nursing for Wexford and has never treated, met, or spoken with the Plaintiff. ECF No. 20, Ex. 3. She further avers that she never interfered with the provision of his medical care. *Id.* As she was not a direct medical provider to the Plaintiff, he cannot sustain his claim of deliberate indifference as to Gilmore, and she is entitled to summary judgment on that claim.

Likewise, the Plaintiff's supervisory liability claim against Gilmore and Wexford fails as the Plaintiff has pointed to no action or inaction on the part of Gilmore or Wexford that resulted in a constitutional injury. The Plaintiff's claims focus on the delivery of primary health care, the failure to approve certain medication, and the failure to provide specialty services. These claims are properly asserted against the direct health care provider(s) during the time at issue. Mere disagreement with a course of treatment does not provide a federal civil rights cause of action. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) ("Questions of medical judgment are not

19

subject to judicial review.").

B.      Eighth Amendment

The Eighth Amendment prohibits "'unnecessary and wanton infliction of pain'" by virtue

of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173

(1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by

statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir.

2003) (*citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). To state an Eighth Amendment claim

for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their

failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires

proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that,

subjectively, the prison staff were aware of the need for medical attention but failed to either

provide it or ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825,

834, 837 (1994); *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that

prisoners will be provided with unqualified access to health care).

The subjective component requires "subjective recklessness" in the face of the serious

medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires

knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."

*Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the

part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because

prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"

*Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) (*quoting Farmer*,

511 U.S. at 844)). If the requisite subjective knowledge is established, an official may avoid

20

liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (*citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked the presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id.* at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge). Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Russell*, 528 F.2d at 319.

The record evidence demonstrates that the Plaintiff suffers from scoliosis, a chronic condition. The record evidence further demonstrates that the Plaintiff has regularly been seen in response to his sick calls slips, and that the response to his sick calls slips has been adequate. He has received a variety of pain medications to ease and manage his chronic pain. The Plaintiff's medical providers have worked with him and with the pharmacist to provide him medications to ease his pain, including analgesics, anti-inflammatory non-steroidal medications, anti-depressants, muscle relaxers, narcotics, oral steroids, and injected steroids.

The Plaintiff has been provided a permanent wheelchair and wheelchair pusher. The medical record is devoid of complaints by the Plaintiff regarding the condition of his wheelchair. Additionally, any repair necessary to the wheelchair is a matter for custodial staff, not medical

staff, to handle. The record evidence demonstrates that the Plaintiff's wheelchair was inspected regularly and appeared to be in functional condition. When repairs were needed, the wheelchair was repaired and a substitute provided.

Additionally, the Plaintiff has been provided physical therapy. While the physical therapy has been interrupted at times by the collegial review process for determining the efficacy of continuation of the therapy, there is no evidence that the Plaintiff was harmed by the brief interruptions in therapy. Moreover, he was instructed in exercises, stretches, and yoga practices that he could do on his own.

The Plaintiff's specially fitted back brace was confiscated by correctional staff at another institution. Medical providers' initial requests for a specially fitted back brace were denied by utilization review. Dr. Ottey avers that there are competing medical concerns to be weighed in determining whether a back brace is therapeutically indicated. Dr. Ottey notes that a back brace may limit pulmonary function and core muscle strength; a concern heightened in the Plaintiff's case, considering his already reduced functional mobility. Dr. Carls recommended that a brace be provided if consistent with security. The Plaintiff was offered a regular back brace but he declined to try it. Ultimately, a specially fitted brace was approved. ECF No. 20, Ex. 2.

The Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence from which a fact-finder could reasonably find in his favor. The Plaintiff has failed to submit any evidence to support his claim that the Defendants provided constitutionally inadequate medical care.

C.     Americans with Disabilities Act

To establish a *prima facie* case under Title II of the ADA, the Plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in, or denied the benefits of,

some public entity's services, programs, or activities for which he was otherwise qualified; and (3)

the exclusion, denial of benefits, or discrimination occurred because of his disability. *See*

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005);

*Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999). States are obligated to make "reasonable

modifications" to enable the disabled person to receive the services or participate in programs or

activities. *See Constantine*, 411 F.3d at 488 (*citing* 42 U.S.C. § 12131(2)). A reasonable

modification does not require the public entity to employ any and all means to make services

available to persons with disabilities. *Id.* Rather, the public entity is obligated to make those

modifications that do not "fundamentally alter the nature of the service or activity of the public

entity or impose an undue burden." *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1082 (11th

Cir. 2007).

To the extent that the Plaintiff claims that a denial of medical treatment violates his rights

under the ADA, his claim fails. Although the Fourth Circuit has not addressed this issue in a

published opinion, unpublished cases from this circuit and opinions from other circuits indicate

that a prisoner may not state a claim under the ADA for a lack of medical treatment.[9]  The

---

[9] *See, e.g. Miller v. Hinton,* 288 Fed. App'x 901, 902 (4th Cir. 2008) (prison's alleged denial of
access to colostomy bags and catheters to inmate, who was a paraplegic confined to a wheelchair
and used such supplies for urinary bladder control, did not constitute disability discrimination in
violation of ADA absent a showing the that inmate was treated in that manner because of his
disability); *Spencer v. Easter,* 109 Fed. App'x 571, 573 (4th Cir. 2004) (failure to provide timely
refills of prescription drugs was not an ADA violation when there was no showing that it was
done based on prisoner's disability); *Burger v. Bloomberg,* 418 F.3d 882, 883 (8th Cir. 2005)
(medical care provided to inmate for his diabetes could not be basis for ADA or Rehabilitation
Act ("RA") action); *Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1144 (10th Cir. 2005)
(inmate's claims under RA and ADA were properly dismissed for failure to state claim as they
were based on medical treatment decisions); *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir. 1996)
(holding that the ADA is not "violated by a prison's simply failing to attend to the medical needs
of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he
was disabled.").

23

Plaintiff has failed to establish that he is disabled within the meaning of the ADA, nor is there any evidence that the Plaintiff was discriminated against because of a disability. Accordingly, his ADA claim fails.

For the reasons stated, summary judgment will be granted in favor of the Defendants Wexford and Janice Gilmore. A separate Order shall be entered in accordance with this Memorandum.

Date:  6/16/14

William D. Quarles, Jr.
United States District Judge

24